IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

IN THE MATTER OF THE SEARCH OF

Case No. 4:21-mj-238

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF

### APPLICATION FOR SEARCH WARRANT

I, **Robert Graves**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as **Redfield, Iowa** hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI).  I have been in this position since January 2015.  I am currently assigned to the FBI's Washington Field Office Violent Crimes Task Force. Among other things, I am responsible for conducing criminal investigations of potential violations of federal criminal laws. During my tenure with the FBI, I have personally participated in numerous criminal investigations to include bank robberies, adult kidnappings, car jackings, fugitive cases, Hobbs Act violations, and other crimes of violence. I have conducted numerous arrests, and executed search warrants and court orders. As such, I have gained both knowledge and experience in gathering and collecting evidence related to violations of Title 18 of the United States Code and other violations of federal law. My training included instruction on investigative tools and criminal law, such as the development and identification of



FILED
By: Clerk's Office, Southern District of Iowa
2:51 pm, Apr 06 2021



GOVERNMENT
EXHIBIT

**GX 1**

4:21-MJ-251

probable cause to support the execution of search warrants.  As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Title 18 U.S.C. § 1512(c)(2) (obstruction of Congress); Title 18 U.S.C. § 111 (assaulting a federal agent); Title 18 U.S.C. § 2111 (Taking or Attempting to Take from a Person Anything of Value by Force and Violence, or by Intimidation, Within the Special Maritime and Territorial Jurisdiction of the United States); Title 18 U.S.C. § 231 (civil disorders); Title 18 U.S.C. § 1752(a)(1), (2), (3), and (4) (unlawful entry on restricted buildings or grounds); and Title 40 U.S.C. § 5104(e)(2) (violent entry, disorderly conduct, and other offenses on capitol grounds) (the "Target Offenses") have been committed by Kyle YOUNG ("the Subject") and other identified and unidentified persons, including others who may have been aided and abetted by, or conspiring with, the Subject, as well as others observed by the Subject.  There is also probable cause to search the PREMISES, further described in Attachment A, for the things described in Attachment B.

## PROBABLE CAUSE

### *Background – The U.S. Capitol on January 6, 2021*

5.      The United States Capitol Police ("USCP"), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

6.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

7.      The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

8.      On January 6, 2021, a joint session of the United States Congress was scheduled to convene at the U.S. Capitol to certify the vote count of the Electoral College of the 2020

4:21-mj-238

Presidential Election, which took place on November 3, 2020 ("Certification"). The exterior plaza of the U.S. Capitol was closed to members of the public.

9.      A crowd began to assemble near the Capitol around 12:30 p.m. Eastern Standard Time (EST), and at about 12:50 p.m., known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

10.     The joint session began at approximately 1:00 p.m. in the House Chamber.

11.     At approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.  Also around this time, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building, in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

12.     As the proceedings continued in both the House and the Senate, USCP attempted to keep the crowd away from the Capitol building and the proceedings underway inside. Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

13.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over additional barricades and law enforcement.  The crowd advanced to the exterior

façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by USCP officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

14.    At about 2:10 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



15.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.  USCP ordered a similar lockdown in the House chamber.  As rioters attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

16.     At approximately 2:30 p.m., known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the federal police officers were injured and several were admitted to the hospital.  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

17.     Also at approximately 2:30 p.m., as subjects reached the rear door of the House Chamber, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

4:21-mj-238

18.    At around 2:45 p.m., subjects broke into the office of House Speaker Nancy Pelosi. At about the same time, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

19.    At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



20.    After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



21.     A subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter, stated "It's Only A Matter of Time Justice is Coming."



22.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.   Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





23.    At around 2:48 p.m., DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

24.    At about 3:25 p.m., law enforcement officers cleared the Senate floor.

25.    Between 3:25 and around 6:30 p.m., law enforcement was able to clear the U.S. Capitol of all of the subjects.

26.    Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized

occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

27.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

28.     Beginning around 9:00 p.m., the House resumed work on the Certification.

29.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. on January 7, 2021.

30.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

31.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

32.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging

4:21-mj-238

and stealing property.  As reported in the news media, others inside and immediately outside the

U.S. Capitol live-streamed their activities, including those described above as well as statements

about these activities.

33.     Photos below, available on various publicly available news, social media, and

other media show some of the subjects within the U.S. Capitol during the riot.  In several of

these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell

phones, including to take pictures and/or videos:



---

[1] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/

4:21-mj-238





---

[2] https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.

[3]https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

### *Facts Specific to This Application*

36.     On January 6, 2021, Metropolitan Police Department ("MPD") Officer M.F. responded to a radio call for assistance at the U.S. Capitol. Officer M.F. was in full MPD uniform and equipped with a body-worn camera. Officer M.F. responded to the west front of the U.S. Capitol and became involved with other officers in the effort to push back rioters from the doorway to the U.S. Capitol at the lower west terrace. While Officer M.F. was defending the doorway, a rioter pulled Officer M.F. into the crowd, where members of the crowd beat, tased, and robbed Officer M.F. of his MPD badge (#3603), police radio, and MPD-issued 17-round magazine, while also trying to forcibly remove his service weapon from its fixed holster. The radio was securely attached to Officer M.F.'s tactical vest, and the badge was pinned to the vest. As a rioter attempted to get Officer M.F.'s gun, Officer M.F. heard him yell words to the effect that he was going to take Officer M.F.'s gun and kill him. Following the assault, Officer M.F. lost consciousness and was hospitalized for his injuries, including a likely concussion and injuries from the taser. Officer M.F. was admitted to the hospital for monitoring of his cardiac activity.

37.     On January 8, 2021, MPD Captain Daniel Godin called Officer M.F. to inquire if Officer M.F. had seen the BOLOs ("be on the lookout," a law enforcement broadcast) that MPD had created. Officer M.F. stated that he had not seen them but would be able to identify the man who had his hand on the grip of Officer M.F.'s gun, trying to remove the gun from his holster. Officer M.F. told Captain Godin that the man said he was going to kill Officer M.F. with his own gun. Captain Godin then showed Officer M.F. the two BOLOs. When Officer M.F. looked at the BOLO included below, he immediately said, "That's him on the right, 100%." When asked what

he did, Officer M.F. said he was the man who had his hand on Officer M.F.'s gun and made threats against him.



38.     On January 27, 2021, Deputy U.S. Marshal Shane Bellis was at work when Court Security Officers notified him that an individual was present with his wife to turn himself in. Bellis met with KYLE YOUNG, who had a copy of BOLO photos from the New York Post. YOUNG pointed to a picture, labeled "116 – AFO" and stated that was him and that he was there to turn himself in. YOUNG stated he was at the Capitol but that he did not have "anything to do with the riots." Bellis verified YOUNG's identity by his state issued photo ID and by his resemblance to FBI BOLO #116-AFO and then contacted the FBI. Bellis stated that he did not have any reason to doubt that YOUNG was the person in the photo. An FBI agent spoke to YOUNG, who said he did not want to say anything without his attorney. YOUNG provided his

4:21-mj-238

address at ████████████████████████████, which was also the address on his driver's license. In late March, 2021, a vehicle was registered to KYLE and ANDREA YOUNG and utilized ████████████████████ as the registration address. YOUNG was with his wife, who provided her cell phone number. Through open source reporting, that cell phone number is associated with YOUNG and his wife. The agent compared the man in front of him to the man in the BOLO photo and did not have any reason to doubt that they were the same man. The photo in the BOLO was taken from a video of the crowd at the Capitol on January 6, 2021.



39.     On March 12, 2021, your affiant spoke to YOUNG's former employer. The former employer viewed the two screenshots below, which were taken from the same videos as the screenshots in the MPD BOLO referenced above and the BOLO in the New York Post

referenced above, respectively. The former employer stated that he was 99% confident that the man in the photos was YOUNG.[4]





40.     Your affiant reviewed a Facebook post from an account for "Kyle Young" with a profile photo of a man who appears to be YOUNG. The Facebook account is associated with a phone number that is attributed to YOUNG and his wife through open source reporting. On

_____

[4] Law enforcement also received multiple tips indicating that FBI BOLO #116-AFO looked like individuals who are not YOUNG. Thus far, your affiant is not aware of any corroboration for these tips and is not aware of any evidence linking those individuals to the Capitol on January 6, 2021.

December 26, 2020, YOUNG asked his Facebook followers if they would like to join him on January 6 at the "stop the steel" rally in Washington, DC.



41.     The FBI received a public tip of a YouTube video, "An incredibly up-close view of the Capitol attack – Parler: u5Z44C9ioner" posted by YouTube account "The Patri0t."[5] The video was recorded immediately outside of the tunnel leading to the lower west terrace exit. In the video, a man from the Political Trance Tribune asks a young man some demographic questions to which the young man states he is from Iowa, he is 16 years old, and his name is C█. YOUNG, who, as shown in the screenshot below, is visible in the video standing next to the young man, then states that he is the young man's father, and his name is "Kyle." The interviewer states, "I am a First Amendment auditor. I don't let cops push me around and I like cops. I got good cops that help me do what I do." YOUNG replies, "There's good cops and bad

---

[5] The video is currently available at https://www.youtube.com/watch?v=XgNfcXwjrQY&feature=youtu.be. This video was filmed at approximately 4:00 pm on January 6, 2021, which was determined by cross-referencing it with an event visible in the video that is also visible in time-stamped surveillance footage from the tunnel. Specifically, at the 2:30 minute marker in the video, a man is visible body-surfing into the tunnel. That same man is also visible body-surfing in surveillance footage of the tunnel, at the time stamp of 4:01 p m.

cops." The video pans away from YOUNG and shows him standing behind a rioter screaming, "Pull the cops out! Pull the police! Grab their hands and pull them out! We've got to pull them out!"



42.     Surveillance footage on January 6, 2021, from the tunnel that leads inside the Capitol on the lower west terrace shows YOUNG and the young man he identified as his son entering the tunnel at approximately 2:43 p.m. While in the tunnel, YOUNG repeatedly moved off camera toward the entrance to the Capitol, where a line of police officers was preventing the rioters from the entering the Capitol. At approximately 2:46 p.m., YOUNG is visible holding his cell phone to his ear in the manner of someone talking on the phone and then holding up his cell phone in the manner of someone recording a video, as seen in the below screenshots.  The young man YOUNG identified as his son and who self-identified as "C▮▮" can also be seen holding his cell phone in the manner of someone recording a video.





43.     At 2:54 p.m., YOUNG is visible on camera holding a strobe light toward the police line, and then pushed forward until he was no longer visible on camera. At 3:00 pm, YOUNG and an unknown individual jointly threw a rectangular object toward the police line. At 3:01 p.m., YOUNG used a long stick-like object to jab toward the police line. YOUNG and his son then exit the tunnel around 3:02 p.m.

4:21-mj-238







4:21-mj-238

44.     At 3:18, another rioter pulled Officer M.F. into the crowd, where various members of the crowd attacked him. At 3:19 p.m., YOUNG is visible on Officer M.F.'s body-worn camera reaching toward the Officer.



45.     In another video, YOUNG can be seen holding Officer M.F.'s left wrist, pulling the officer's arm away from his body. Officer M.F. reported that YOUNG tried to gain control of Officer M.F.'s gun and had his hand on top of the officer's gun at one point. Officer M.F. also reported that YOUNG said words to the effect that he would get the officer's gun and kill him with his own gun.[6]

---

[6] The words are not audible on Officer M.F.'s body-worn camera.

4:21-mj-238



46.     After YOUNG assaulted him, Officer M.F. was swept away in the crowd. YOUNG quickly pivoted toward where rioters were pulling another Officer, U.S. Capitol Police Officer M.M. into the crowd. YOUNG joined in the assault of Officer M.M. by grabbing at his helmet and putting his hands on the officer.[7]

_____

[7] Officer M.M. said that before he was pulled into the crowd, he was sprayed with bear spray, so his eyes were burning. He was also disoriented by being pulled into the crowd. He remembered struggling with people in the crowd, but he does not specifically remember anyone trying to hit him, grab his visibility vest, or grab his helmet. While he was in the crowd, two men protected him and escorted him to Constitution Avenue. He was not injured. He does know that his visibility vest was ripped by the time he made it to Constitution Avenue and assumed it got ripped in the struggle although he does not know how.



4:21-mj-238

47.     As described above, there is evidence that Subject had in his possession a digital device while at the U.S. Capitol on January 6, 2021.  In addition, based on photos and videos of the offenses that date, numerous persons committing the Target Offenses possessed digital devices that they used to record and post photos and videos of themselves and others committing those offenses.  Further, based on the investigation, numerous persons committing the Target Offenses possessed digital devices to communicate with other individuals to plan their attendance at the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

48.     Moreover, it is well-known that virtually all adults in the United States use mobile digital devices.  In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that that same 2019 report estimated that 81% of Americans use at least one smartphone.  *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Jan. 9, 2021).

49.     In addition, in my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to

prevent loss.  Indeed, some companies provide services that seamlessly sync data across devices, such as Apple devices and the Apple iCloud service.  Thus, there is reason to believe that evidence of the offense that originally resided on the Subject's cell phone and his son C████'s cell phone may also be saved to other digital devices within the PREMISES.  Moreover, here, as widely reported in the news media related to this matter, many individuals committing the Target Offenses kept and posted videos, photos, and commentary about their participation in these offenses, essentially bragging about their participation.  Based on that, there is also probable cause to believe that evidence related to these offenses may have been transferred to and stored on digital devices beyond the particular digital device the Subject possessed during the offenses.

50.    Based on my training and experience, and discussions with other law enforcement officers, I know that it is common for individuals such as the Subject who make threats against government officials, to possess weapons such as firearms, ammunition, and their electronic devices in secure locations within their residences, motor vehicles, other real property which they have dominion and control, and on their person.  I also know that these same individuals carry their electronic devices on their person and in their vehicles as they travel from place to place.  Specifically:

   a.  Those making threats to injure through internet commerce often maintain evidence of their criminal activity at locations that are convenient to them, such as their residences and inside their vehicles.  This evidence often includes research related to their targets and victims and other documentary evidence relating to commission of their crimes.  Those making threats through interstate commerce sometimes take or cause to be taken

25

photographs and/or video recordings of themselves and their illegal activity, and may have photo or video security systems that record images from their homes or property.  These individuals usually maintain these photographs and recordings in their possession, at their premises, or at some other safe place.

b.  Those making threats to injure through interstate commerce often maintain weapons, including guns and ammunition, in secure locations such as their residences and vehicles.

c.  As set forth above, the Subject here used electronic devices to access facilities of interstate commerce to make threats and incite violence.  Based on my training and experience, I am aware that persons involved in such activities will typically keep the instrumentalities of their crime, including but not limited to the electronic devices, to include computers, cellular telephones and tablets, used in the commission of the aforementioned offenses in their residences. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on electronic devices, computer hard drives, or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

51.     Based on my training and experience, and on conversations I have had with other law enforcement officers, I know that some individuals who participate in activities aimed at disrupting or interfering with governmental and/or law enforcement operations have been known to use anonymizing services and/or applications capable of encrypting communications to protect their identity and communications. By using such tools, in some cases, the only way to see the content of these conversations is on the electronic device that had been used to send or receive the communications.

52.     The property to be searched includes the mobile phones of KYLE YOUNG, and his son 16-year-old son C███ hereinafter the "Device(s)."

53.     KYLE YOUNG and his son C███ used the devices to film in the tunnel on the lower west terrace of the Capitol. The devices likely therefore contain fruits and instrumentalities via recordings, photos and other information of the underlying offences. Given that individuals almost invariably keep their cell phones near their person and within their residence, the Devices will likely be located within the confines of the property to be searched.

## TECHNICAL TERMS

54.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data

4:21-mj-238

## <u>CONCLUSION</u>

70.     I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

**Robert Graves**
**Special Agent**
**FBI – Washington Field Office**

Subscribed and sworn pursuant to reliable electronic means and Fed. R. Crim. P. 4.1 and

41(d)(3) on **April 6, 2021**.

Helen C. Adams
Chief United States Magistrate Judge

50